**BAYPO LIMITED PARTNERSHIP,**
Baypo I LLC, Baypo II LLC, and
Bayer Corporation, Plaintiffs

v.

**TECHNOLOGY JV, LP, PO Offtake**
**LP, and Lyondell Chemical**
**Company, Defendants.**

C.A. No. 2693–VCL.

Court of Chancery of Delaware,
New Castle County.

Submitted: July 24, 2007.
Decided: Oct. 2, 2007.

21

A. Gilchrist Sparks, III, Esquire, Jay N. Moffitt, Esquire, Morris, Nichols, Arsht & Tunnell, LLP, Wilmington, DE, for the Plaintiffs.

Michael D. Goldman, Esquire, Kevin R. Shannon, Esquire, Bradley W. Voss, Esquire, Abigail M. LeGrow, Esquire, Potter Anderson & Corroon, LLP, Wilmington, DE; Paul R. Elliott, Esquire, Baker Botts, LLP, Houston, TX; George T. Shipley, Esquire, Shipley Snell Montgomery, LLP, Houston, TX, for the Defendants.

***OPINION***

LAMB, Vice Chancellor.

The plaintiffs in this action lost in arbitration based on contract language they claim does not reflect the agreement of the parties but instead (at least as interpreted by the arbitrators) is the result of mistake. The plaintiffs now seek to reform the contract, arguing that their claim for reformation is not subject to the otherwise broad arbitration clause governing the parties' commercial relationship. The defendants move to dismiss arguing, among other things, that the claims asserted are subject to arbitration.

In light of the recent decision of the Delaware Supreme Court in *James & Jackson LLC v. Willie Gary*,[1] the court must first determine whether, under the terms of the parties' agreement, the issue of arbitrability is one that must be addressed by an arbitrator, rather than by the court. Having reviewed the relevant agreements, the court concludes that the issue of arbitrability is for an arbitrator to decide because the arbitration clause is broadly worded, expressly references the Rules of the American Arbitration Association, and explicitly provides that an arbitrator shall decide all substantive and procedural issues related to disputes. The court reaches this conclusion despite the fact that the arbitration provision expressly permits limited access to the courts for injunctive or equitable relief to protect the rights of the parties or the status quo during the pendency of an arbitration. That limited right to judicial access does not negate the clear intention of the parties to assign issues of arbitrability to an arbitrator.

I.

A. *The Parties*[2]

The plaintiffs in this case are Bayer Corporation and its affiliates, BAYPO

1. 906 A.2d 76 (Del.2006).

2. The facts in this opinion are taken from the complaint and the attached documents relat-

ing to the transaction. *Winston v. Mandor*, 710 A.2d 835, 838 n. 6 (Del.Ch.1997) (citing *Vanderbilt Income and Growth Assocs., L.L.C.*

Limited Partnership, BAYPO I LLC, and BAYPO II LLC. The defendants are Lyondell Chemical Company, its affiliate, PO Offtake LP, and Technology JV, LP. In the interest of clarity, the court will refer generally to the plaintiffs as Bayer and the defendants as Lyondell, unless specifically noted.

### B. *The Transaction*

This action arises out of Bayer's March 31, 2000, purchase of Lyondell's worldwide polyols business for $2.45 billion. Polyols, along with isocyanate, are the principle ingredients employed in the production of polyurethane foam, a widely used product in the petrochemical industry. This acquisition complimented Bayer's existing isocyanate production business and strengthened its position in the polyurethane foam market. The overall transaction was embodied in the Master Transaction Agreement ("MTA"), signed by Bayer Corporation and Lyondell Chemical Company.[3]

A crucial objective of the acquisition to Bayer was to ensure a predictable and low-cost supply of propylene oxide ("PO"), the primary ingredient for making polyols. To ensure Bayer received this critical raw material, Bayer and Lyondell entered into a 50–year joint venture for the production of PO to supply Bayer's polyols plants. To operate this joint venture, Bayer and Lyondell created two Delaware limited partnerships, PO JV, LP (the "PO Partnership") and Technology JV, LP (the "Technology Partnership"). The PO Partnership acquired two of Lyondell's PO manufacturing facilities.[4] Lyondell operates these two plants on behalf of Lyondell and Bayer under an operating agreement not relevant in this proceeding.

Bayer and Lyondell formed the second partnership, Technology Partnership, to own the manufacturing technology and patent rights necessary to produce PO (the "PO Technology"), as well as to grant licenses to use the PO Technology under these patents. The Technology Partnership entered into a royalty bearing, nonexclusive, nontransferable License Agreement (the "License Agreement") with BAYPO, which allowed Bayer to use the PO Technology to produce PO.[5] If Bayer produced PO outside the field of use delineated in the License Agreement, Bayer was required to pay Lyondell an "accom-

*v. Arvida/JMB Mgrs., Inc.,* 691 A.2d 609, 612–13 (Del.1996)) ("Documents appended to the parties' briefs in support [of] or in opposition to a motion to dismiss are properly considered if they are incorporated by reference in the complaint or if not relied upon for the truth of their contents."). *See also In re General Motors S'holder Litig.,* 897 A.2d 162, 168 (Del.2006) (for limited purposes the trial court may consider documents referenced in the complaint on a motion to dismiss).

3. Bayer AG was also a signatory to this document, but is not named in this litigation.

4. Lyondell had supplied all of the PO to the polyols business it sold to Bayer, including these two plants, and Lyondell owned the manufacturing technology and the rights necessary to produce PO at the joint venture plants.

5. Specifically, section 2.01(a) of the License Agreement permits Bayer:

> to use PO [t]echnology to manufacture PO Product in the United States and (i) to use PO Product in the production of B[ayer]'s [polyols] and to sell PO product as an integral part of B[ayer]'s [polyols], (ii) to use PO Product in the fields of making, using and selling [polyols] throughout the world. . . .

Voss Aff. Ex. 3 at 3. The License Agreement defines PO Product as PO produced by the two plants owned by the PO Partnership. Section 2.01(b) limits Bayer to the manufacture of PO Product at the PO Partnership plants. Further, section 2.01(c) limits Bayer "to using PO Product to make [polyols]" at BAYPO, the signatory of the License Agreement, or its affiliate plants. *Id.*

modation fee." [6]

This litigation derives from Bayer and Lyondell's conflicting viewpoints as to Bayer's field of use under the License Agreement, and therefore the imposition of accommodation fees, in the context of five "tolling contracts" [7] Lyondell entered into before the acquisition and assigned to Bayer as part of the overall transaction.[8] Bayer maintains that, notwithstanding certain language found in the PO Partnership Agreement and the License Agreement, the parties agreed that the tolling contracts were within the field of use contemplated in the License Agreement and thus not subject to accommodation fees.[9]

## C. *The Arbitration Clause* [10]

The MTA contains a broad arbitration clause providing that disputes "shall be submitted to mandatory and binding arbitration" and that "arbitration shall be conducted in accordance with the *Commercial Arbitration Rules of the American Arbitration Association* in effect on the date the notice of arbitration is served." [11] It further states:

> The dispute resolution provisions . . . shall be the binding and exclusive means to resolve all disputes arising under the [a]greement . . . *provided, however,* that [the dispute resolution procedures] shall not limit either party's recourse to courts of competent jurisdiction for injunctive or equitable relief that may be necessary to protect the rights and property of such party or maintain the status quo before, during or after the pendency of the process set forth in [the dispute resolution procedures].[12]

The dispute resolution procedures also state that:

> The [a]rbitrators shall decide all [d]isputes and all *substantive and procedural issues related thereto,* and shall enforce this [a]greement in accordance with its terms. Without limiting the generality of the previous sentence, the [a]rbitrators shall have the authority to issue injunctive relief; however, the [a]rbitrators shall not have any power or authority to (i) award consequential . . . incidental, indirect or punitive damages

6. Section 9.6 of the PO Partnership Agreement states "[t]o the extent that Bayer LP receives a distribution-in-kind of PO Product . . . that it uses outside the field of use specified in the License Agreement, Lyondell LP will accommodate Bayer LP. . . ." Voss Aff. Ex. 2 at 30.

7. In this context, "tolling" refers to the processing of PO into polyols.

8. These tolling contracts were with Arch Chemicals, Inc.; Carpenter Company; Ethox Chemicals, Inc.; ICI Americas, Inc.; and Quest Technologies.

9. The final relevant document in this case is a Limited Partnership Purchase and Sale Agreement (the "Sale Agreement"). That instrument provided for the sale of limited partnership units in the PO Partnership to BAYPO I and BAYPO II from a Lyondell subsidiary.

10. Article I of the MTA states that the "Documentary Conventions . . . shall govern this Agreement." The Documentary Conventions' paragraph (d), entitled "Alternate Dispute Resolution," states that "[a]ll controversies or disputes arising out of and related to the Transactions shall be resolved in accordance with the procedures set forth in Appendix C to the [MTA]." Appendix C contains the dispute resolution procedures. The term "Transactions" is defined as "the transactions contemplated in the Transaction Documents." Section 2.05 of the MTA defines "Transaction Documents as the MTA and each closing document attached as an Exhibit to [the MTA]." Voss Aff. Ex. 1.

11. Voss Aff. Ex. 1 App. C at 2–3 (emphasis added).

12. *Id.* at 1 (emphasis in original).

or (ii) amend this [a]greement.[13]

### D. *Procedural History*

Significant differences arose between the parties soon after the consummation of the transaction. In December 2004, Bayer filed a demand for arbitration seeking relief based on a variety of claims.[14] Lyondell asserted several counterclaims, among them a claim that Bayer was failing to pay accommodation fees owed from the assigned tolling contracts and other tolling arrangements not relevant to this litigation.[15] After extensive proceedings, the arbitrators issued a final award on May 18, 2006, among other things ordering Bayer to pay Lyondell over $121 million in unpaid past accommodation fees for the years 2000 to 2005, more than $108 million of which was based on the five tolling contracts assigned to Bayer in the acquisition. The award also ordered Bayer to pay accommodation fees on all third-party tolling transactions going forward.[16]

Lyondell filed an action on June 27, 2006 in Texas state court to confirm the award.[17] Bayer removed the action to the United States District Court for the Southern District of Texas, Houston Division, and filed a motion to vacate the arbitrator's final award. On March 20, 2007, the federal district court affirmed the final award in all relevant respects.[18] During the pendency of the Texas federal court action, Bayer filed its complaint in this court seeking to reform the License Agreement, based on a theory of mistake, to conform with its understanding that it can secure PO from the five assigned tolling contracts without paying Lyondell accommodation fees.

### II.

The issue before the court is whether an arbitrator should determine jurisdiction over Bayer's claims. Thus, only a concise discussion of the parties' factual allegations and substantive claims is warranted.

### A. *Bayer's Claims*

The complaint contains a claim for unilateral mistake, seeking reformation of the

---

13. *Id.* at 4 (emphasis added).

14. The claims were: (1) the proper assessment to Bayer of fixed costs for PO production, (2) charges by Lyondell for incremental costs and co-product penalties, (3) Bayer's claim of flexibility to vary from the annual plan for PO production and delivery, and (4) Lyondell's violation of the non-compete agreement. Bayer also made a damages claim that was not addressed in that arbitration.

15. In defending this counterclaim, Bayer contended (1) that Lyondell waived any such argument because it had never claimed accommodation fees were owed from the assigned tolling contracts, and (2) that the contracts, properly interpreted, did not require Bayer to pay accommodation fees for using the assigned tolling contracts. Bayer alleges that it did not ask the arbitrators to reform the contracts, whether under a theory of mutual mistake, unilateral mistake, or otherwise. According to the plaintiffs, the only mention made by Bayer of any possible mistake was in a section of one of its briefs. In that brief, as in this suit, Bayer argued that extrinsic evidence supported its contention that the contracts did not require Bayer to pay accommodation fees for using the assigned tolling contracts.

16. Compl. 4, 13–14.

17. The terms of the arbitration clause provided: "The arbitration award shall be final and binding on the parties, and judgment thereon may be entered in any court of competent jurisdiction, and may not be appealed except to the extent permitted by the Federal Arbitration Act." Voss Aff. Ex. 1 App. C at 4.

18. The court permitted limited discovery with respect to the calculation of accommodation fees owed by Bayer for supplying PO to Carpenter, one of the five entities assigned to Bayer as part of the transaction with Lyondell.

License Agreement, and a claim for unjust enrichment. Both claims stem from the accommodation fees the arbitrator awarded Lyondell. Bayer only contests the aspect of the award based on the five assigned tolling contracts. Bayer alleges that, based on negotiations with Lyondell, both parties understood the language in section 2.01(c) of the License Agreement stating, "Bayer Partner's plant or its Affiliates' plants" as including the five assigned tolling contracts.[19] According to Bayer, this interpretation includes the five tolling contracts under the purview of the License Agreement, thus exempting Bayer from paying accommodation fees based on those agreements.[20] Bayer alleges that this specific prior agreement is also shown by the explicit actions and positions taken by Lyondell prior to closing, by confirming statements by Lyondell after closing, and by Lyondell's failure to charge such accommodation fees for nearly five years.[21]

## B. *Lyondell's Response*

Lyondell responded by filing a motion to dismiss asserting that Bayer's claims are barred by the doctrines of *res judicata* and collateral estoppel predicated on the prior arbitration award. Lyondell also argues that the court lacks subject matter jurisdiction because Bayer's claims are subject to mandatory arbitration. Finally, Lyondell contends that the complaint fails to state a claim upon which relief may be granted and thus, must be dismissed pursuant to Court of Chancery Rule 12(b)(6).

## III.

The court will first consider whether the issue of the arbitrability of this dispute is itself arbitrable. If so, it is for an arbitrator to decide whether Bayer's claims are subject to arbitration and, if the answer to that question is affirmative, it will be up to an arbitrator to hear and resolve Lyondell's other grounds for dismissal. This issue is subject to the analysis articulated in the Delaware Supreme Court's recent holding in *James & Jackson, LLC v. Willie Gary*.[22] In that decision, the court reiterated the controlling general rule articulated by the United States Supreme Court, which requires questions of substantive arbitrability to be decided by the courts. Importantly, the Delaware Supreme Court also adopted the exception to this rule which is recognized in a majority of federal courts, noting Delaware's interest in encouraging arbitration. This exception applies where there is "clear and unmistakable evidence" that the parties did not intend to submit questions of arbitrability to the courts. This exception specifically provides that "reference to the AAA rules evidences a clear and unmistakable intent to submit arbitrability issues to an arbitrator."[23]

In discussing this exception, the Delaware Supreme Court carefully stated that it does not apply in all cases where the AAA rules are incorporated into an arbitration clause. The court held that this exception will only be triggered "where the arbitration clause generally provides for arbitration of all disputes and also incorporates a set of arbitration rules that empower arbitrators to decide arbitrability."[24] Indeed, in *Willie Gary* the trial court properly determined the question of arbitrability because, while the arbitration

**19.** Compl. 8–9.

**20.** *Id.* at 15.

**21.** *Id.* at 2, 13.

**22.** 906 A.2d 76 (Del.2006).

**23.** *Id.* at 80.

**24.** *Id.*

clause first expressly provided for arbitration of any disputes in accordance with the AAA rules, it later permitted nonbreaching parties to pursue claims for specific performance and injunctive relief in court. The arbitration clause in that case stated:

Any controversy or claim arising out of or relating to this [a]greement or the breach of this [a]greement shall be settled by arbitration ... in accordance with the then-existing rules of the American Arbitration Association ("AAA").... Each [m]ember agrees with the other [m]embers that the other [m]embers would be irreparably damaged if any of the provisions of this [a]greement are not performed in accordance with their specific terms.... Accordingly, it is agreed that, in addition to any other remedy to which the non-breaching [m]embers may be entitled at law or in equity, the nonbreaching [m]embers shall be entitled to injunctive relief to prevent breaches of the provisions of this [a]greement and specifically to enforce the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having subject matter jurisdiction thereof.[25]

The court reasoned that the tenor of the arbitration provision taken as a whole did not indicate the requisite clear and unmistakable evidence of intent since the clause could not be interpreted as generally referring all controversies to arbitration.[26]

## IV.

■ Applying *Willie Gary* here, the specific language of the arbitration clause in the MTA will be the pivotal touchstone for determining whether Bayer should have presented or should now present the question of arbitrability of the instant claims to an arbitrator. As discussed above, the arbitration clause in the MTA references the AAA rules and it generally provides for all disputes to be submitted to arbitration. Thus, the dispositive issue is whether the language in the MTA permitting resort to judicial relief in certain defined circumstances has the same doctrinal significance as the broader language in *Willie Gary*. The operative phrase in the MTA states that the dispute resolution procedures:

[S]hall not limit either party's recourse to courts of competent jurisdiction for injunctive or equitable relief that may be necessary to protect the rights and property of such party or maintain the status quo before, during or after the pendency of the process set forth in the [dispute resolution procedures].[27]

Bayer argues that, as in *Willie Gary*, this language removes the arbitration clause from the majority exception. As discussed, the Delaware Supreme Court in *Willie Gary* refused to apply the majority exception because the arbitration provision expressly authorized broad judicial recourse for injunctive relief and specific performance.[28] The court held that this provision negated any possible conclusion that the parties demonstrated a clear and unmistakable intent to submit matters of arbitrability to an arbitrator.[29]

The arbitration clause in this case does not contain the same broad language as the decisive language in *Willie Gary*. On the contrary, the provision relied on by Bayer is narrowly tailored to provide the

**25.** *Id.* at 79–80.

**26.** *Id.* at 81.

**27.** Voss Aff. Ex. 1 App. C at 1.

**28.** *Willie Gary,* 906 A.2d at 81.

**29.** *Id.*

parties with limited ancillary relief to protect their interests during the pendency of the arbitration process. This clause does not provide the same boundless and independent access to judicial relief that prompted the ruling in *Willie Gary*. Additional support for this conclusion is found in the clause in the MTA specifically directing that an arbitrator decide all substantive and procedural issues.[30]

■ Since it is clear that the controlling arbitration clause meets the majority exception adopted in Delaware and thus requires matters of arbitrability to go to an arbitrator, the court turns now to Bayer's alternative argument, which contests the application of the arbitration clause to non-signatories of the MTA. Bayer contends that BAYPO, BAYPO I LLC, BAYPO II LLC, Technology Partnership, and PO Offtake are not parties to the MTA and therefore are not bound by its arbitration clause. To buttress this claim, Bayer also points to the lack of an arbitration clause in the License Agreement.

This position is contrary to Delaware law and to common sense. Foremost, all of these parties are affiliates owned by Bayer or Lyondell and were created for the sole purpose of furthering the transaction outlined in the MTA.[31] As noted, the

transaction at issue was exceptionally complex and necessarily involved a number of inter-related documents. The parties Bayer points to signed either the PO Partnership, the License Agreement, or the Sale Agreement.[32] Each of these documents expressly incorporates the provisions of the MTA and should be read as part of one comprehensive transaction. The factual background of the transaction, which identifies each of these agreements as integral pieces of the acquisition, supports this conclusion. In addition, it is undisputed that these agreements served no other independent purpose than their function in the framework of the MTA.

The structure of the transaction evinces the definite intention of the signatories that these agreements be contemplated as one document. The MTA, the Sale Agreement, and the License Agreement were all signed on March 31, 2000. The PO Partnership appears to have been signed on March 17, 2000, but the closing date for the property contributions was also March 31, 2000.[33] Based on these facts, the court must read the Sale Agreement, the License Agreement, and the PO Partnership Agreement together with the MTA as one document, bound by the arbitration provi-

**30.** Bayer's argument is also undercut by the express language in the clause that authorizes an arbitrator to grant injunctive relief, thus supporting the more limited reading.

**31.** The Technology Partnership was a partnership formed by affiliates owned by Bayer and Lyondell.

**32.** PO Offtake and BAYPO signed the PO Partnership Agreement. The Technology Partnership, through its general partner, along with BAYPO I signed the License Agreement. BAYPO II signed the Sale Agreement described *supra* note 9.

**33.** While the case law indicates that in order for documents to be read together they must be executed on the same day, under these

circumstances such a finding would be nonsensical. *See Karish v. SI Int'l*, 2002 WL 1402303, at *3 (Del.Ch. June 24, 2002) ("Where two agreements are executed on the same day and are coordinated to the degree outlined above, in essence, they form one contract and must be examined as such." (*quoting E.I du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1115 (Del. 1985))). The parties to the PO Partnership were obviously delaying the key transfer, and thus the effective date, until Bayer and Lyondell executed the MTA. This, along with the incontrovertible correlation, creates a sufficient nexus to justify the merging of all of these documents.

sion.[34]

In addition, it appears that the PO Partnership Agreement, the Sale Agreement, and the License Agreement were attached as exhibits to the MTA.[35] The language of the MTA identifies these instruments in the table of contents as exhibits and refers to the text of the respective documents.[36] All three agreements also specifically refer to the MTA in such a way that it is clear those documents are part of the MTA.[37] The MTA, as described above, defines exhibits as "Transactions" governed by the arbitration clause. Thus, the signatories of the PO Partnership, the Sale Agreement, and the License Agreement, which includes each of the parties identified by Bayer, are required to follow the dispute resolution mechanism enumerated in the MTA.[38]

## V.

For the foregoing reasons, the plaintiffs are directed to make an appropriate claim in arbitration within 30 days. The defendants' motion to dismiss for failure to state a claim upon which relief may be granted is DENIED without prejudice. The action is STAYED pending the outcome of the arbitration proceeding. IT IS SO ORDERED.

---

34. See Karish, 2002 WL 1402303, at *3 ("The specific provisions of these [a]greements and the interrelationship thereof make it clear that the parties intended these two [a]greements to operate as two halves of the same business transaction." (quoting E.I du Pont de Nemours & Co., 498 A.2d at 1115)).

35. Bayer states in its answering brief to the motion to dismiss that the License Agreement was not an exhibit to the MTA, but "a separate agreement entered into by separate entities." Pls.' Answering Br. 22. While this court is required to accept the well-pleaded allegations of the complaint as true, it is not required to accept conclusions unsupported by specific allegations of fact, especially where the documents before the court clearly indicate otherwise. See Grobow v. Perot, 539 A.2d 180, 188 n. 6 (Del.1988).

36. This finding is also consistent with the overall scheme of the transaction. The PO Partnership was the entity that facilitated the production of PO for the joint venture created in the MTA. The Sale Agreement transferred shares in the PO Agreement from Lyondell to Bayer. The License Agreement authorized Bayer to utilized the intellectual property associated with the manufacturing of polyols.

37. The PO Partnership Agreement states: "As contemplated by the [MTA], Lyondell GP, Lyondell LP and Bayer LP desire to establish a joint venture in the form of a limited partnership to engage in the production of PO and related co-products in the United States." Voss Aff. Ex. 2 at 1; The Sale Agreement incorporates the payment amount in the MTA and it integrates the "Transaction Documents," which is a term defined in the MTA. Second Voss Aff. Ex. 23 at 1–3.

38. Bayer also argues that an arbitrator is not permitted to address its claims since it seeks to amend the agreement, which an arbitrator is not authorized to do. While this contention may have merit, it should be properly presented to an arbitrator. Rule R–7(a) of the AAA rules provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement."