COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



§

ENCORE ENTERPRISES, INC.,
A TEXAS CORPORATION, §
ENCORE BORDERPLEX, LLC,       No. 08-17-00134-CV
EMF GRAND MISSION §
INVESTMENTS, LP, AND       Appeal from
ENCORE MF SENDERO, L.P., §

      County Court at Law No. 6

Appellants, §

      of El Paso County, Texas

v. §

      (TC # 2016-DCV2446)

BORDERPLEX REALTY TRUST, A §
MARYLAND REAL ESTATE
INVESTMENT TRUST, AND §
BRT REALTY OPERATING LIMITED
PARTNERSHIP, §

Appellees. §

## O P I N I O N

In this appeal, we decide if two sophisticated entities under the tenets of Delaware law have agreed to exclusively arbitrate their disputes. The trial court concluded they did not, and retained the case for trial in a Texas courtroom. We affirm.

## BACKGROUND

Encore Enterprises, Inc. (and its related entities Encore Borderplex, LLC, EMF Grand Mission Investments, LP, and Encore MF Sendero, LP)(all collectively "Encore") held five

properties that were in various stages of development as multi-family apartments. Borderplex Realty Trust (and its related entity BRT Realty Operating Limited Partnership)(collectively "Borderplex") supposedly had access to available capital. This lawsuit arises from an agreement between Encore and Borderplex. Under the agreement, Encore for the most part would sell or contribute its properties to a new entity that Borderplex, for the most part, would fund. The new entity would then issue to both Encore and Borderplex ownership shares reflective of their respective contributions. Designated members of both Encore and Borderplex would then manage the new entity.

The parties' agreement is memorialized in a December 17, 2015 "Contribution Agreement." Under the agreement, on or before the date of an "initial closing," the new entity would be formed, and both parties would execute a separate "Operating Agreement," that as its name suggests, defined the logistics of developing and managing the properties. An unsigned draft of the Operating Agreement was attached to the Contribution Agreement. The parties were obligated to execute the Operating Agreement "in substantially the form" as it was attached to the Contribution Agreement.

The Contribution Agreement contemplated that there could be several closings, as each of the five Encore properties were either sold or contributed to the new entity. As it turns out, however, the initial closing never took place. After Encore placed Borderplex on notice that it is was in default under the Contribution Agreement for failing to make the initial closing, Borderplex filed this declaratory judgment lawsuit. The lawsuit principally alleges that the first closing was prevented by third parties, or conditions precedent that were never met, and that Borderplex did not breach the Contribution Agreement. In particular, Borderplex claims that one of its investors

2

failed to provide funding under a separate subscription agreement.[1]  The suit seeks a declaration that Borderplex was under no obligation to close, that Encore was not entitled to recover damages, and that Borderplex's performance was excused by Encore's material breach of the Contribution Agreement and/or promissory estoppel.

Conversely, Encore in another forum has alleged that individual members of Borderplex fraudulently misrepresented, or fraudulently failed to disclose, Borderplex's financial ability to fund the projects, and misrepresented how the properties were to be managed.  Whatever the truth of the parties' competing claims, we face here only the question of whether the parties have agreed to exclusively mediate, then arbitrate this dispute, verse litigate the matter in a court of law.  In response to Borderplex's suit, Encore filed a motion to dismiss, or in the alternative, to abate the suit based on its claim that the parties must arbitrate any dispute.  The trial court denied Encore's motion, and Encore filed this interlocutory appeal challenging that decision.  *See* TEX.CIV.PRAC.& REM.CODE ANN. § 171.098(a)(1)(West 2011)(allowing interlocutory appeal of denial of motion to compel arbitration).

The nub of the dispute is this:  the Contribution Agreement itself contains no arbitration clause, but the unsigned Operating Agreement does.  With that in mind, we set forth more of the parties' agreement as it pertains to how the Contribution Agreement incorporated the unsigned Operating Agreement.

## THE CONTRIBUTION AGREEMENT

The recital portions of the Contribution Agreement outline the parties' intended dealings. Encore through various subsidiaries, owned or controlled five multi-family apartment projects in various stages of development.  The parties contemplated that two of the projects would be sold,

---

[1] Failing that condition, Borderplex was obligated to pay a substantial break-up fee, which it alleges that it has paid to Encore.

and three projects would be contributed by Encore to a newly formed company. Borderplex would come to the table with just over $47 million dollars, used to pay for both the acquisition and development costs. The newly formed company would then own, develop, and operate each of the respective properties. It would issue ownership units to Encore and Borderplex in designated proportion to the parties' contributions of cash or property.

The properties would be managed and run under the terms of a separate Operating Agreement. Recital G of the Contribution Agreement provides that:

> G. [Borderplex and Encore], upon the issuance of the Units and as owners thereof, shall have such rights, obligations and preferences as holders of Units as set forth in the Operating Agreement of the Company, dated as of the date of the Initial Closing, substantially in the form attached hereto as Exhibit A (the 'Operating Agreement').

Section 1.01 of the agreement similarly provided that:

> On or prior to the date of the Initial Closing, [Borderplex and Encore] shall (1) cause the filing of a certificate of formation of the Company, in a mutually acceptable form, (2) execute the Operating Agreement, in substantially the form attached hereto as Exhibit A, (3) cause the Company to issue Units as specified in Section 1.05 hereof, and make the other deliveries as specified in Section 5.03 hereof.

No closing was ever held and the Operating Agreement was never executed. And while the Operating Agreement as attached to the Contribution Agreement details multiple facets of how the projects would be funded and managed, it was incomplete. It contains a blank for an effective date ("Effective as of February ___, 2016") and it omits several schedules, such as those including a budget, the calculation of incentive fees, and employee compensation schedules.

But central to Encore's position, Section 9.10 of the Contribution Agreement, which addresses "Exhibits and Schedules," states:

> All Exhibits and Schedules referenced herein *are expressly incorporated* into this Agreement. [Emphasis supplied].

4

The incomplete Operating Agreement was one of those exhibits, and it has a section addressing mediation and arbitration:

**15.1 Mediation.**

**(a) Agreement to Use Procedure.** The Members have entered into this Agreement in good faith and in the belief that it is mutually advantageous to them. It is with that spirit of cooperation that they agree to attempt to resolve any legal dispute amicably and without the necessity of litigation. Accordingly, the Members agree that in the event of any dispute, difference or question as to any matter arising under or relating to this Agreement or the breach thereof which cannot be otherwise resolved (the *"Dispute"*), they will first utilize the procedures specified in this Section (the *"Procedure"*) prior to, in the case of a dispute that is arbitrable, the commencement of any arbitration proceeding under Section 15.2.
 …

**15.2 Arbitration.**
**(a) Arbitration Proceedings.** If, following the conclusion of the [mediation], the Dispute is still not resolved, and if the Dispute is of such a nature that either Party would be entitled to relief at law or equity (*i.e.,* an actionable disagreement, as opposed to a difference of opinion or dispute as to management or business philosophy), then, any Disputing Party may initiate arbitration proceedings in accordance with this and the succeeding Subsection. The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association, or pursuant to such other rules and procedures upon which both Members may agree.

The Contribution Agreement itself makes several specific references to arbitration. Section 9.12 allows for specific performance "subject to the mediation and arbitration of this Agreement and the Operating Agreement":

**Section 9.12 <u>Specific Performance</u>**. Each of the Parties acknowledges and agrees that the other Party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, *subject to the mediation and arbitration provisions of this Agreement and the Operating Agreement*, each of the Parties agrees that the other Party shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any action instituted in any court of competent jurisdiction, in addition to any other remedy to which such Party may be entitled, at law or in equity. [Emphasis supplied]

A section on "default" and "remedies" also alludes to either a judicial or an arbitration forum:

**Section 8.03 <u>Costs and Expenses</u>**. The costs and expenses of any legal action initiated to enforce a Party's rights under this Agreement, including reasonable attorneys' fees, shall be borne by the Party that is not the prevailing Party in such action, or *may be allocated equitably by the judge or arbitrator* if each Party prevails as to some issues. [Emphasis supplied]

The Contribution Agreement contemplates two distinct types of defaults, and addresses remedies for each. One type of default is defined in Section 8.01 and provides:

**Section 8.01 <u>Default; Remedies</u>**. The following events shall constitute a default ("Default") under this Agreement: (a) failure by any Party to perform any obligation required under the terms of this Agreement which continues for a period of fifteen (15) days after the giving of written notification from the non-defaulting Party ("Non-Defaulting Party") to the defaulting Party ("Defaulting Party"), or if such breach cannot reasonably be cured within fifteen (15) days, the failure of the Defaulting Party to commence such cure within fifteen (15) days and diligently prosecute the same to completion; and (b) insolvency, receivership, bankruptcy or any similar proceeding initiated by or against a Party. Upon the occurrence of a Default, the Non- Defaulting Party shall have the right to terminate this Agreement.

All other defaults are addressed in Section 8.02:

**Section 8.02 <u>Indemnification</u>**. With respect to any other default under this Agreement not included in the definition of Default set forth immediately above, such as a breach of a representation or warranty pertaining to a Pipeline Project with respect to which a Closing has already occurred, the Parties shall look exclusively to the indemnification rights and obligations set forth in the Operating Agreement, and any such dispute or controversy arising with respect to the same shall be resolved in accordance with the procedures set out in Article 14 of the Operating Agreement, and shall be subject to the survival period set forth in Section 14.2 of the Operating Agreement.

In turn, Article 14 of the Operating Agreement details how claims for "Indemnified Loss" were to be made between the "Members," a defined term meaning each person who signed the Operating Agreement. And if not resolved under Article 14, then the Indemnified Loss would be resolved under Article 15, which as we set out above, includes the mediation and arbitration provisions that Encore claims are applicable here.

Finally, the Contribution Agreement states:

6

**Section 9.07  Governing Law**

 …

Any action or proceeding brought for the purpose of enforcement of any term or provision of this Agreement shall be brought only in the federal or state courts sitting in El Paso, Texas, or Dallas, Texas.

## ARBITRATION UNDER THE FAA AND DELAWARE LAW

The Contribution Agreement provides that it is governed by Delaware law; the parties also agree that underlying transaction involves interstate commerce, thereby invoking the Federal Arbitration Act (FAA). Delaware arbitration law mirrors that of the FAA. *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 79 (Del. 2006)("Delaware arbitration law mirrors federal law[.]"). We accordingly look to both federal and Delaware precedents to resolve this appeal.[2]

The FAA states that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.A. § 2 (2009). The FAA was enacted "to reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S.Ct. 1647, 1651, 114 L.Ed.2d 26 (1991). Nonetheless, the FAA's purpose is to make arbitration agreements "as enforceable as other contracts, but not more so." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967). "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582, 80 S.Ct.

---

[2] We look to Texas law, however, for our own procedural standard of review. *Longview Energy Co. v. Huff Energy Fund LP*, 533 S.W.3d 866, 872 (Tex. 2017)("The law of Texas, as the forum state, governs matters of procedure."); *McAfee, Inc. v. Agilysys, Inc.*, 316 S.W.3d 820, 824 (Tex.App.--Dallas 2010, no pet.)("In applying a contractual choice-of-law provision, Texas courts apply the substantive law of the choice-of-law provision but apply Texas law to matters of remedy and procedure."). Under Texas law, we review *de novo* a trial court's determination as to the existence of a valid agreement to arbitrate. *See In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009)(orig. proceeding); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003); *Kmart Stores of Texas, L.L.C. v. Ramirez*, 510 S.W.3d 559, 565 (Tex.App.--El Paso 2016, pet. denied)("Whether the parties agreed to be bound to an arbitration agreement is a contract formation question we review *de novo,* deferring to the trial court's findings of historical fact as between the parties so long as those determinations are supported by evidence.").

7

1347, 1352, 4 L.Ed.2d 1409 (1960). Stated otherwise, arbitration "is a matter of consent, not coercion[.]" *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479, 109 S.Ct. 1248, 1256, 103 L.Ed.2d 488 (1989).

Applying these FAA principals, Delaware courts distinguish between substantive and procedural disputes over arbitrability. "Substantive arbitrability issues are gateway questions about the scope of an arbitration provision and its applicability to a given dispute. The court presumes that parties intended courts to decide issues of substantive arbitrability. The opposite presumption applies to procedural arbitrability issues, such as waiver, or satisfaction of conditions precedent to arbitration." *Willie Gary*, 906 A.2d at 78-79, *citing Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, 123 S.Ct. 588, 591, 154 L.Ed.2d 491 (2002)("The question of whether the parties have submitted a particular dispute to arbitration, *i.e.* the '*question of arbitrability,*' is an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.")[internal quotes omitted]. Thus, if a contract contains an arbitration clause, challenges to the validity of the contract as a whole are for the arbitrator to decide. *See Prima Paint*, 388 U.S. at 403-04, 87 S.Ct. at 1806. But challenges to the *formation* of a contract are "generally for courts to decide." *See Granite Rock Co. v. Int'l Broth. of Teamsters*, 561 U.S. 287, 296, 130 S.Ct. 2847, 2855-56, 177 L.Ed.2d 567 (2010); *see also Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1, 126 S.Ct. 1204, 1208, 163 L.Ed.2d 1038 (2006)(distinguishing between challenges to a contract's validity and challenges to its formation).

But adopting another federal caveat, Delaware courts also recognize that the parties might agree to submit to the arbitrator any question over arbitrability. "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns up what the parties agreed about that

8

matter." *DMS Properties-First, Inc. v. P.W. Scott Associates, Inc.*, 748 A.2d 389, 392 (Del. 2000), *quoting First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S.Ct. 1920, 1923, 131 L.Ed.2d 985 (1995). If there is "clear and unmistakable evidence that they did so," parties can leave issues of arbitrability solely to the arbitrator. *Id.* at 944, 115 S.Ct. 1920. In *Willie Gary,* the Delaware Supreme Court adopted as a matter of policy "the majority federal view" that (1) where an arbitration clause generally provides for arbitration of all disputes, and (2) incorporates the American Arbitration Association's commercial arbitration rules into a contract, the parties have evidenced a clear and unmistakable intent to submit arbitrability issues to an arbitrator.[3] 906 A.2d at 80.[4]

Under these precepts, Encore advances four issues contending that the trial court erred in refusing to compel arbitration. But we turn first to Borderplex's argument that Encore has waived the right to insist on arbitration because it filed suit against several Borderplex board members alleging fraud.

### HAS ENCORE WAIVED ITS RIGHT TO ARBITRATE?

Borderplex filed its declaratory judgment suit in El Paso on June 29, 2016. Encore answered the suit on September 2, 2016, and twenty-four days later, filed its motion to dismiss or abate based on the arbitration clause. The trial court heard the motion on April 3, 2017, and denied the motion at the hearing. On April 28, 2017, Encore filed suit in Dallas County against ten

---

[3] This so because Rule 7 (a) of the Commercial AAA rules provides that "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." See "Commercial Including Procedures for Large, Complex Commercial Disputes Arbitration Rules and Mediation Procedures" at https://www.adr.org/sites/default/files/Commercial%20Rules.pdf (last visited January 11, 2018).

[4] The lower Delaware courts have applied what could be called a third prong to the *Willie Gary* test: that if a party meets the *Willie Gary* test*,* then a court must still make a preliminary determination that the argument in favor of arbitration is not frivolous. *Legend Natural Gas II Holdings, LP v. Hargis*, CA No. 7213-VCP, 2012 WL 4481303, at *6 (Del. Ch. Sept. 28, 2012); *McLaughlin v. McCann*, 942 A.2d 616, 626-27 (Del. Ch. 2008); Suzanne H. Holly, Margaret E. Juliano, Recent Developments Concerning Enforcement of Adr Provisions, 15 Del. L. Rev. 55, 64 (2014).

individuals, who are all identified as members of the Board of Trustees for Borderplex. The suit asserts various fraud claims based on alleged fraudulent representations, or omissions, by the individual defendants. The representations and omissions pertained to Borderplex's ability to raise funds, how the new entity would be managed, and efforts to re-negotiate several terms of the transaction.

Borderplex now asserts that Encore's resort to the courts in the Dallas action waives its right to invoke arbitration, if arbitration even applies. And indeed, a party can waive an arbitration clause by substantially invoking the judicial process to the other party's detriment or prejudice. *RSL Funding, LLC v. Pippins*, 499 S.W.3d 423, 430 (Tex. 2016); *Perry Homes v. Cull*, 258 S.W.3d 580, 589-90 (Tex. 2008).[5] But "[t]here is a strong presumption" against waiver under the FAA, which make the waiver hurdle "a high one." *Id.* We look to the "totality of the circumstances" to decide if a party has waived an arbitration right, which includes multiple factors identified by our supreme court.[6] Borderplex does not specifically address those factors, and our own review leads to the conclusion that there is no waiver here.

Encore promptly moved to arbitrate the dispute, and only after the trial denied its motion, did it file the second lawsuit, while simultaneously appealing the trial court's ruling. *See In re ReadyOne Industries, Inc.*, 294 S.W.3d 764, 772 (Tex.App.--El Paso 2009)(orig. proceeding) (pursuing discovery *after* motion to compel arbitration was denied did not constitute waiver). Even

---

[5] Like our standard of review, we view the waiver claim as another procedural issue controlled by Texas law. But in any event, the parties point to no substantive differences in how Texas and Delaware would analyze the issue.

[6] Those factors include: (1) whether the party asserting the right to arbitrate was the plaintiff or defendant in the lawsuit, (2) how long the party waited before seeking arbitration, (3) the reasons for any delay in seeking to arbitrate, (4) how much discovery and other pretrial activity the party seeking to arbitrate conducted before seeking arbitration, (5) whether the party seeking to arbitrate requested the court to dispose of claims on the merits, (6) whether the party seeking to arbitrate asserted affirmative claims for relief in court, (7) the amount of time and expense the parties have expended in litigation, and 8) whether the discovery conducted would be unavailable or useful in arbitration. *See G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 512 (Tex. 2015); *Perry Homes*, 258 S.W.3d at 590-92.

10

at that, While the suits share interrelated subject matter, the Dallas suit is against different parties, and raises distinct issues from those in the declaratory judgment suit below. As the Texas Supreme Court has said, "a party who litigate[s] one claim with an opponent d[oes] not substantially invoke the litigation process for a related yet distinct claim against another party with whom it ha[s] an arbitration agreement." *Kennedy Hodges, L.L.P. v. Gobellan*, 433 S.W.3d 542, 545 (Tex. 2014); *see also Richmont Holdings, Inc. v. Superior Recharge Sys., L.L.C.*, 455 S.W.3d 573, 576 (Tex. 2014)("Merely filing suit does not waive arbitration, even when the movant, as in this case, files a second, separate suit in another county based in part on a contract at issue in the first action."). Finally, Borderplex has failed to make any credible claim of prejudice distinctly flowing from the filing of the second suit that would not have otherwise occurred had arbitration commenced.

Because Borderplex has failed to meet its burden to show waiver, we reject its claim that any arbitration rights, if they exist, were waived.

## DOES THE INCORPORATION BY REFERENCE OF THE UNSIGNED OPERATING AGREEMENT MAKE THAT DOCUMENT'S ARBITRATION AGREEMENT IMMEDIATELY EFFECTIVE?

Turning to the merits, Encore's central argument, advanced in its first issue, is that Section 9.10 of the Contribution Agreement expressly incorporates all the exhibits and schedules, which includes the unsigned Operating Agreement, along with its arbitration clause. Delaware law, like Texas law, allows parties to incorporate by reference other writings into a contract, and upon doing so, the terms of those other writings become enforceable obligations. *See Realty Growth Investors v. Council of Unit Owners*, 453 A.2d 450, 454 (Del. Supr. 1982)("A contract can be created by reference to the terms of another instrument if a reading of all documents together gives evidence of the parties' intention and the other terms are clearly identified.")[citations omitted]; *State ex rel. Hirst v. Black*, 83 A.2d 678, 681 (Del. Super. 1951)("Where a contract is executed which refers to

11

another instrument and makes the conditions of such other instrument a part of it, the two will be interpreted together as the agreement of the parties."); s*ee also In re Bank One, N.A*., 216 S.W.3d 825, 826 (Tex. 2007)(incorporation of arbitration agreement on bank signature card). The fact that the other writing is unsigned is not dispositive--the incorporation of the document evidences the parties' intent that it may be enforced.

While we do not dispute the importance of incorporation by reference, we think it misses the point of why the Operating Agreement was included as an attachment and when its terms should become effective. The parties contemplated that in the future they would close on several properties, and then would develop and manage those properties. *When* they did so, they required an agreement to govern the properties. The Contribution Agreement itself refers to the future execution of the Operating Agreement. Recital G. states that "upon the issuance" of ownership units in the yet to be formed company, and as of the date of an initial closing, the parties would have certain rights stated in the Operating Agreement. Section 1.01 of the Contribution Agreement similarly provided that "on or prior to the date of the Initial Closing" the parties would execute the Operating Agreement. The closing was the event which would necessitate the execution of the Operating Agreement.[7]

Encore does not contend otherwise, but nonetheless claims Section 9.10 by incorporating the draft Operating Agreement made all its terms, including the arbitration clause, *immediately* enforceable. This construction, however, is at odds with how we view a Delaware court would

---

[7] Encore directs us to provisions in the Contribution Agreement requiring both Encore and Borderplex to deliver to each other and the new company "counterpart signature pages to this Agreement and the Operating Agreement, *as and if applicable,* duly executed by [the appropriate party]." [Emphasis supplied]. The "as and if applicable" language, however, negates any obligation to immediately execute the Operating Agreement unless the initial closing occurred simultaneously with the execution of the Contribution Agreement.

construe the Contribution Agreement.[8]  "The proper construction of any contract . . . is purely a question of law[.]  *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1266-67 (Del. 2017), *quoting Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).  As the Delaware Supreme Court describes its review:

> Our objective is to determine the intent of the parties from the language of the contract.  This inquiry should focus on the parties' shared expectations at the time they contracted, but because Delaware adheres to an objective theory of contracts, the contract's construction should be that which would be understood by an objective, reasonable third party.  If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract, or to create an ambiguity.

*Exelon*, 176 A.3d at 1267 [internal quotes and footnotes omitted].  A Delaware court would also read the contract as a whole and give each provision and term effect, so as not to render any part of the contract mere surplusage.  *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010).  Nor would a Delaware court read a contract to render a provision or term "meaningless or illusory. . . .  When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions."  *Id*. at 1159-60.  While Delaware courts attempt "to honor the reasonable expectations of the parties and ordinarily resolve any doubt as to arbitrability in favor of arbitration," this policy "does not trump basic principles of contract interpretation."  *Parfi Holding AB v. Mirror Image Internet, Inc.,* 817 A.2d 149, 155-56 (Del. 2002).

Applying a construction that makes all the terms of the Operating Agreement *immediately* effective violates several of these tenants, particularly with regards to how Article 8 of the Contribution Agreement appears to operate.  As we set out above, Article 8 of the Contribution Agreement refers to two different types of defaults:  (1) those under Section 8.01 (uncured defaults

---

[8] "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995).

in the obligations arising under the Contribution Agreement); and (2) those under Section 8.02 (all other defaults, "such as a breach of a representation or warranty pertaining to a [contributed property] with respect to which a Closing has already occurred.")  It was only this second class of Section 8.02 defaults for which the agreement directed the parties back to the mediation and arbitration provisions of the Operating Agreement.  The final Section under Article 8-- Section 8.03-- allows the prevailing party in "any legal action" to collect attorney's fees and costs, or as may be "allocated equitably by the judge or arbitrator" if a party only partially prevailed.  In harmonizing these provisions, an objective and reasonable view of Section 8 is that it contemplates the possibility of both litigation and arbitration, and the only example of the class of arbitrable disputes are those occurring post-closing.

Encore's construction, however, would require arbitration of any dispute, negating the *omission* of a reference to mediation-arbitration in Section 8.01, and negating the affirmative reference to legal actions and court rulings in Section 8.03.  Article 8 also must be read in light of the specific performance provisions in Section 9.12.  That section allows for a court based legal injunction "to prevent breaches of the provisions . . . and to enforce specifically the terms and provisions" of the Contribution Agreement.  Section 9.12 is "subject to the mediation and arbitration provisions of this Agreement and the Operating Agreement," but parsing Article 8 and Section 9.12 together leads to a construction that Section 8.01 defaults might be addressable by a court, and other breaches--such as post-closing defaults--were intended to be handled only under the Operating Agreement.

And important here, this litigation began when Encore through a demand letter asserted a default under *Section 8.01*.  Encore's notice of default letter stated that it was providing "formal notice, in accordance with Section 8.01" of the Contribution Agreement that Borderplex had failed

14

to "perform certain material obligations under that agreement." Borderplex then filed suit asserting it was not in default because several conditions precedent to any closing never occurred.

Encore points out, however, that the broad definition of an "Indemnified Loss" under Article 14 of the Operating Agreement would include breaches of the Contribution Agreement.[9] From this, Encore reasons that Section 8.02's incorporation of Article 14 then must necessarily govern any breach of the Contribution Agreement. That construction, however, swallows all of Section 8.01 and renders it superfluous--something at odds with how Delaware would interpret an agreement. *Osborn*, 991 A.2d at 1159-60 (contract must be read as a whole so as not to render any part of the contract mere surplusage). Rather, we construe Section 8.02 to govern post-closing issues which might indeed include breaches of warranties from the Contribution Agreement that survive any closing. Section 8.01 governs pre-closing breaches of the Contribution Agreement.

Contrary to Encore' suggestion, our construction does not leave a "gaping hole" in the remedies for breaches of the Contribution Agreement. A pre-closing breach of the Contribution Agreement is addressable under Section 8.01, and the several provisions of the agreement referring to the court actions. After a closing, Article 14 and 15 of the Operating Agreement (which by that time would be certainly executed and fully in effect) would govern a breach of that agreement, or applicable breaches of the Contribution Agreement (such as a warranty that survives closing).

Nor does our construction make the incorporation of the Operating Agreement superfluous. The Contribution Agreement substantively needed some terms from the Operating Agreement to deal with post-closing issues that might arise under the Contribution Agreement. For instance, if

---

[9] Article 14 defines one type of "Indemnified Losses" to include:

> Any and all loss, liability or damage, . . . suffered or incurred by an Indemnified Person by reason of any untrue representation, breach of warranty or nonfulfillment of any covenant by the Indemnifying Member contained herein *or in the Contribution Agreement* or in any certificate, document or instrument delivered by the Indemnifying Member pursuant to or in connection with this Agreement *or the Contribution Agreement*; [Emphasis supplied].

15

there was a cost overrun for one of the properties to be developed (which could only occur post-closing), Borderplex was obligated to fund the cost overrun up to a specified limit. If it failed to timely do so, the Contribution Agreement recites that any loss would be handled under Section 14 of the Operating Agreement. That section of the Operating Agreement is more than simply attached--it is incorporated, but in practice could only have legal significance after a closing had already occurred.

Encore also directs us to an unpublished Delaware decision where a contribution agreement, which incorporated an operating agreement, required arbitration of disputes arising under either agreement. *See Nolu Plastics, Inc. v. Ledingham,* No. 20445-NC, 2005 WL 5654418 (Del. Ch. Dec. 17, 2005). The contribution agreement in that case contained an arbitration clause, and it incorporated by reference an operating agreement that apparently did not. *Id*. at \*3. The court held that a dispute arising under the operating agreement was nonetheless subject to arbitration because the parties intended for the terms of the contribution agreement to govern any disputes of the parties. *Id.* While not doubting the wisdom of the decision, we think it misses the point here. The Contribution Agreement here evidences a different intent. It sets up two class of disputes, only one of which is channeled back to the Operating Agreement. Moreover, it contemplated the Operating Agreement would be executed later, consistent with the class of post-closing claims that might arise post-closing. Nothing in *Nolu Plastics* suggests Delaware would otherwise construe the agreement here.

Encore also claims that because the Contribution Agreement and the Operating Agreement were intended to work in tandem, they must be construed together, giving effect to the terms of each. *See E.I. du Pont de Nemours & Co. v. Shell Oil Co., Inc.*, 498 A.2d 1108, 1115 (Del. 1985)(two agreements negotiated, drafted and executed simultaneously, were construed together).

16

To be sure, the Contribution Agreement refers to various provisions of the Operating Agreement, and outlines how future problem would be resolved under the terms of the Operating Agreement.[10] But those potential issues all appear to be post-closing issues. At or before the initial closing, a final Operating Agreement would have been signed and undoubtedly in force and effect. That the parties outlined how future post-closing contingencies would have been handled, does not make every provision of the Operating Agreement *immediately* effective before any closing.

In sum, Encore's construction unnecessarily contorts the structure of Article 8, and under Delaware law we could not apply a construction that subverts the parties intended plan or scheme. *See GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P*., 36 A.3d 776, 779 (Del. 2012)("The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan.").

**THE VENUE CLAUSE ALSO UNDERMINES ENCORE'S CONSTRUCTION**

Section 9.07 of the Contribution Agreement provides that any action or proceeding brought to enforce any term or provision of the Contribution agreement "shall be brought only" in a court in El Paso or Dallas. Borderplex contends this provision belies any construction requiring all disputes to be arbitrated. In its second issue, Encore suggests this provision is boilerplate, or only applies to a suit to enforce an arbitration award, or for specific performance or injunctive relief. But if the provision was so limited, it would have said so, rather than using the broader language covering enforcement of any term or provision of the Contribution Agreement. Instead, Section 9.07 buttresses our construction of the Contribution Agreement: one class of disputes requires arbitration, but one class does not. Encore through its notice of default letter initiated a dispute

---

[10] The Contribution Agreement substantively references the Operating Agreement in eleven provisions. It also incorporates the definitions of some terms as specifically defined in the Operating Agreement.

not governed by the mediation/arbitration provisions, effectively leaving the dispute for a Dallas or El Paso court.

Encore further argues that this single provision cannot undermine the overall scheme of the agreement. We agree with that rule of contract construction, but conclude that Section 9.07 is consistent with how Sections 8.01 and 8.02 were intended to operate. Finally, Encore developed a record below which included a "red-lined" draft of the Contribution Agreement exchanged by the parties during their negotiations. Based on that draft, Encore divines the parties' intent based on several changes suggested by Borderplex's counsel. Nonetheless, we decline to draw any inferences from the red-lined draft for two reasons. First, we have no need to refer to parol evidence unless the agreement is ambiguous, a finding that neither the trial court nor this Court has made. *Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 360 (Del. 2013)("We consider extrinsic evidence only if the contract is ambiguous."). Second, the Contribution Agreement has a joint drafting clause that precludes any inference from the authorship of any provision.[11] Encore's arguments regarding Section 9.12 are unappealing, and we overrule Issue Two.

## SHOULD AN ARBITRATOR DECIDE ARBITABILITY?

In its third issue, Encore asks that we order an arbitrator to resolve any disputes about arbitrability of the disputes below. And as we note above, both the FAA and Delaware law contemplate that parties can agree to let an arbitrator decide the threshold question of whether a dispute falls within the scope of an arbitration clause or not. To accomplish that result, the parties must in "clear and unmistakable" terms indicate the desire to leave issues of arbitrability solely to

---

[11] The Contribution Agreement includes this provision:

> **Section 9.11 Construction**. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

18

the arbitrator. *Willie Gary*, 906 A.2d at 80. They meet that standard when an arbitration clause (1) generally provides for arbitration of all disputes, and (2) incorporates the AAA arbitration rules, and (3) the argument for arbitration is "non-frivolous." *Id*.; *McLaughlin*, 942 A.2d at 626-27.

Guided by two Delaware opinions, we conclude the parties did not clearly and unmistakably leave the issue of arbitrability to the arbitrator under the first prong of the test. In *Willie Gary*, the court upheld the trial court denial of arbitration. 906 A.2d at 82. The agreement there required arbitration of any controversy arising out of the parties' contract and it incorporated the AAA rules. *Id*. at 79-80. However, it expressly authorized the non-breaching party to obtain injunctive relief and specific performance in the courts. *Id*. "Thus, despite the broad language at the outset, not all disputes must be referred to arbitration. Since this arbitration clause does not generally refer all controversies to arbitration, the federal majority rule does not apply, and something other than the incorporation of the AAA rules would be needed to establish that the parties intended to submit arbitrability questions to an arbitrator." *Id*. at 81. In other words, the injunctive relief carve out was sufficiently broad to negate the first prong of the *Willie Gary* test (that arbitration applies to all disputes).

We contrast *Willie Gary* with *BAYPO Ltd. Partnership v. Technology JV, LP,* where a court reached the opposite result, but based on a more narrowly tailored carve out clause. 940 A.2d 20, 26 (Del. Ch. 2007). The contract in *BAYPRO* allowed the parties to seek injunctive or equitable relief, but only as necessary to protect "the rights and property of such party or maintain the status quo before, during or after the pendency" of any arbitration. *Id*. The agreement additionally directed that an arbitrator decide all substantive and procedural issues. *Id* at 27.

Read together, the decisions teach that the "carve outs and exceptions to committing disputes to arbitration should not be so obviously broad and substantial as to overcome a heavy

presumption" that incorporating the AAA Rules intends that the arbitrator decide all issue of arbitrability. *McLaughlin*, 942 A.2d at 625. In the Contribution Agreement before us, those carve outs are sufficiently broad to overcome the presumption. As we discuss above, Section 8.01 broadly includes any breaches of the Contribution Agreements, and under the most appropriate construction, allows them to be judicially resolved. Only a narrower class of claims--those post-closing--are clearly governed by the arbitration agreement in the Operating Agreement. And like *Willie Gary*, the Contribution Agreement additionally carves out specific performance and injunctive relief to prevent breaches of the Contribution Agreement, or to enforce its terms. We conclude that because of the scope of these carve outs, Encore has failed to show the agreement commits all disputes to arbitration, and thus no presumption arises that the parties intended to have an arbitrator determine arbitrability. Accordingly, we overrule Issue Three.

## DOES AN SUPERCEDED PLEADING CHANGE THE CALCULAS?

In its fourth issue, Encore also asserts something of its own waiver/estoppel argument by arguing that in a prior, and now superseded pleading, Borderplex asserted a claim for violation of the Operating Agreement. Such a claim would necessarily invoke the Operating Agreement's arbitration clause. Borderplex's Second Amended Petition alleged:

> In the alternative and without waiving the foregoing, [Borderplex's] performance under the Contribution Agreement is excused by [Encore's] material breach of contract and/or promissory estoppel. [Encore] made promises, representations, and commitments to [Borderplex] in February 2016 with respect to (i) *modifications in the method of calculating fees due to Encore Borderplex, LLC under the Operating Agreement . . . .* [Emphasis supplied].

By the time of the trial court heard Encore's motion to compel arbitration, however, Borderplex had filed a Third Amended Petition that replaced the above italicized language, and qualified it to address only the "proposed draft of the Operating Agreement" which would only become effective

20

once the parties reached an agreement on additional terms.  Nonetheless, Encore contends the allegations in the Second Amended Petition are broad enough to trigger the arbitration clause.

Generally, "[a] plaintiff's timely filed amended pleading supersedes all previous pleadings and becomes the controlling petition in the case regarding theories of recovery."  *Elliott v. Methodist Hosp.,* 54 S.W.3d 789, 793 (Tex.App.--Houston [1st Dist.] 2001, pet. denied); *see also* TEX.R.CIV.P. 63, 65.  Borderplex's amended pleading superseded and replaced its prior pleading. *See* TEX.R.CIV.P. 65; *Elliott,* 54 S.W.3d at 793.  Given the procedural facts here, we decline to consider the superseded pleading.  *See ENGlobal U.S., Inc. v. Gatlin*, 449 S.W.3d 269, 278 n.4 (Tex.App.--Beaumont 2014, no pet.)(also noting effect of superseded pleading).  We overrule Issue Four.

Having overruled all of Encore's issues, we affirm the decision of the trial court and remand the case for further proceedings.


September 28, 2018

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.
McClure, C.J. not participating

21